UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RANDY LYNN,                          )
     *Plaintiff*,                    )
                                   )
     *vs*.                         )     No. 1:13-cv-00179-JMS-TAB
                                   )
CITY OF INDIANAPOLIS, ET AL.,         )
     *Defendants*.                  )

## <u>ORDER</u>

Plaintiff Randy Lynn filed this action against Defendants City of Indianapolis and Indianapolis Metropolitan Police Department ("<u>IMPD</u>") Officers Timothy Huddlestone and Nathan Challis, alleging claims under 42 U.S.C. § 1983, the Americans with Disabilities Act ("<u>ADA</u>"), and several claims under state law. Presently pending before the Court is Defendants' Motion for Summary Judgment as to all of Mr. Lynn's claims. [Filing No. 33.] For the reasons that follow, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissi-

ble in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898.

Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND

Mr. Lynn, who was forty-seven years old at the time of the events in question, was diagnosed with epilepsy at the age of seven. [Filing No. 37-1 at 20; Filing No. 37-1 at 43.] Because of his epilepsy Mr. Lynn often has seizures, which are commonly triggered by exposure to intense light, such as sunlight, the reflection of light off of snow or ice, or flashing lights. [Filing No. 37-1 at 43; Filing No. 35-2 at 10.]

The night of February 1, 2011, there was a snow storm in Indianapolis. [Filing No. 37-1 at 27-28.] The following morning, on February 2, Mr. Lynn went to clear the snow and ice from the doorway of a smoke shop managed by his sister, Tracy Lynn. [Filing No. 37-1 at 27-28.] After clearing the snow and ice, Mr. Lynn left the smoke shop and began the fifteen-to-twenty minute walk home. [Filing No. 37-1 at 27-29.] He remembers walking east along Washington Street toward his home for five to ten minutes. [Filing No. 37-1 at 31-32.] Mr. Lynn's next memory is being placed in an ambulance. [Filing No. 37-1 at 27; Filing No. 37-1 at 45.] The parties do not dispute that sometime during Mr. Lynn's walk home, he had a seizure. [*See* Filing No. 37-1 at 44.]

Around 1:30 p.m. that same day, a taxi cab driver called 9-1-1 and stated that there was a man lying down in a parking lot on Washington Street who "looked like he was having convulsions, seizures, something like that." [Filing No. 32, Track 2 at 00:22-00:26.] The 9-1-1 dispatcher stated over the IMPD radio that there was "a person down in the 2300 block of West Washington Street" and that the "subject was down, possibly having a seizure. EMS is in route." [Filing No. 32, Track 4 at 00:16-00:20.] The dispatcher also sent a message to IMPD officers

over the Computer-Assisted Dispatch system ("CAD"), which read in pertinent part: "IN AN EMPYT PARKING LOT A MALE DK COAT WITH HOODIE BJNS IS DOWN POSS HAVING A SEIZURE." [Filing No. 52-1 at 2.]

Officer Challis was approximately a mile away from that location when he heard the dispatcher's statement. [Filing No. 35-4 at 8-9.] He responded to the dispatcher that he was in route to the scene, but does not remember looking at his computer screen to see the message dispatched via the CAD. [Filing No. 35-4 at 8.] Officer Huddlestone, who was closer than Officer Challis, also proceeded to the scene after he heard the dispatcher's statement and saw the CAD message on his computer. [Filing No. 35-3 at 7.]

Officer Huddlestone arrived on the scene first. [Filing No. 35-3 at 8.] He saw a man pointing him toward the direction of a closed business. [Filing No. 35-3 at 6-7.] Officer Huddlestone exited his police car and observed Mr. Lynn in the direction that the man was pointing. [Filing No. 35-3 at 12.] Mr. Lynn had his back to Officer Huddlestone and was stumbling through an empty parking lot. [Filing No. 35-3 at 12.] Officer Huddlestone walked onto the sidewalk and called out to Mr. Lynn, "Hey, man. Come over here," and gestured for Mr. Lynn to walk towards him. [Filing No. 35-3 at 12.] Mr. Lynn turned around and "stumble[d]" toward Officer Huddlestone. [Filing No. 35-3 at 12-13.] As Mr. Lynn approached, Officer Huddlestone observed that Mr. Lynn was "covered in blood" and had a "white powdery substance on his nose, inside his nostrils and on his upper lip." [Filing No. 35-3 at 13.] More specifically, Officer Huddlestone observed a "heavy amount" of blood on Mr. Lynn's face and some on Mr. Lynn's clothing, and the white substance was "bright, bright white," "very obvious," "only from his lip up," and there were "chunks of it hanging out of the inside of [Mr.] Lynn's nose." [Filing No. 35-3 at 14.] Mr. Lynn's pupils also looked very small. [Filing No. 35-3 at 14.] Based on these

observations, Officer Huddlestone believed that Mr. Lynn had "snorted some type of narcotic." [Filing No. 35-3 at 16.]

Mr. Lynn walked up to Officer Huddlestone but did not say anything to him. [Filing No. 35-3 at 16-17.] Officer Huddlestone told Mr. Lynn that he "need[ed] to sit down" because Officer Huddlestone was afraid Mr. Lynn "was going to fall, and [Officer Huddlestone] didn't want him to walk into the street." [Filing No. 35-3 at 17.] Mr. Lynn did not verbally respond or sit down as requested. [Filing No. 35-3 at 20.] Officer Huddlestone described what happened next as follows:

> I kind of got behind him, and I was holding onto his triceps asking to him to sit down. And I asked him three or four times, just put a little bit of pressure kind of downward on his triceps, and he wouldn't sit. . . . And he was extremely wobbly, and I was pretty certain that I was going to fall down, so I just took my right foot and kind of swept out his left foot, and then just bore his weight and just helped him down on the ground.

[Filing No. 35-3 at 17.] Mr. Lynn immediately tried to stand back up by pushing himself up off the ground, but in doing so, his body pushed into Officer Huddlestone's feet, which caused Officer Huddlestone to fall on top of Mr. Lynn. [Filing No. 35-3 at 23-24.] Officer Huddlestone again told Mr. Lynn to "just sit down" and "[r]elax," but again, Mr. Lynn did not respond. [Filing No. 35-3 at 24.] Mr. Lynn began "twisting," which caused him and Officer Huddlestone to begin sliding toward the street. [Filing No. 35-3 at 25.] Officer Huddlestone was concerned that they would slide into the street, so he tried to keep Mr. Lynn "pinned down" since he knew Officer Challis was coming. [Filing No. 35-3 at 25.] Despite Officer Huddlestone's significant height and weight advantage, [Filing No. 35-3 at 18-19], Mr. Lynn seemed "extremely strong" to Officer Huddlestone, so he was unable to "just flip him over, flatten him out and wait until [Officer] Challis got there" as Officer Huddlestone intended, [Filing No. 35-3 at 27.] Officer Hud-

dlestone believed that Mr. Lynn's "extreme[]" strength was another sign that Mr. Lynn was on narcotics. [Filing No 35-3 at 27.]

As Officer Huddlestone was attempting to pin Mr. Lynn down, a city bus stopped next to them, and the driver opened the door and asked Officer Huddlestone if he was all right. [Filing No. 35-3 at 27.] Officer Huddlestone responded that he was. [Filing No. 35-3 at 27.] At that time, an IMPD cameraman (who was monitoring an IMPD camera near the location) stated over the radio that "an officer has a resister."[1] [Filing No. 35-3 at 27.] Officer Huddlestone pinned Mr. Lynn down with his knee, then grabbed his radio and responded that he was "okay" and that he had the man "pinned down" and needed Officer Challis to continue to the scene. [Filing No. 35-3 at 27-28.] An unknown man—who Officer Huddlestone subsequently learned to be Jeffery Bell—then approached Officer Huddlestone and asked if he was okay, but without waiting for a response, the man began assisting Officer Huddlestone by grabbing Mr. Lynn. [Filing No. 35-3 at 30.] Mr. Bell heard Officer Huddlestone repeatedly request that Mr. Lynn place his hands behind his back, but instead of doing so, Mr. Lynn "kept stiffening up his arms underneath his body." [Filing No. 35-6 at 3.]

At this point, Officer Challis arrived on the scene. [Filing No. 35-3 at 31; Filing No. 35-6 at 3.] He began to assist Officer Huddlestone and Mr. Bell withdrew his assistance. [Filing No. 35-6 at 3.] The two officers pulled Mr. Lynn toward the sidewalk, away from the road. [Filing No. 35-3 at 31.] Officer Huddlestone was on Mr. Lynn's left side, while Officer Challis struggled to subdue Mr. Lynn's flailing legs. [Filing No. 35-3 at 31.] Officer Huddlestone was able

---

[1] Although it is clear there is a video recording of at least part of the incident, as both parties reference it, the video was unfortunately not submitted by either party as part of the summary judgment record.

to attach his handcuffs to Mr. Lynn's left hand, but Officer Challis could not pull Mr. Lynn's right hand out from underneath him.  [Filing No. 35-3 at 32.]

After the three men struggled for a short while longer, Officer Challis told Mr. Lynn that if he did not stop resisting being handcuffed he would be tased.  [Filing No. 35-3 at 33; Filing No. 35-4 at 29.]  Mr. Lynn did not respond verbally, or otherwise.  [Filing No. 35-4 at 29.]  Officer Challis pulled down Mr. Lynn's coat from around his neck and tased Mr. Lynn in the neck for five seconds on drive stun mode.  [Filing No. 35-3 at 34; Filing No. 35-4 at 29.]  The taser did not have a "heavy effect" on Mr. Lynn; instead, it had "the normal effect that pain would cause a person," but not a "compliance effect."  [Filing No. 35-3 at 34.]  Officer Challis continued to try and free Mr. Lynn's right arm while stating that noncompliance would lead to Mr. Lynn being tased again.  [Filing No. 35-4 at 32.]  The officers were unable to free Mr. Lynn's right arm, so Officer Challis pushed up Mr. Lynn's coat and tased him in the small of his back for five seconds, again with the taser on drive stun mode.  [Filing No. 35-3 at 35; Filing No. 35-4 at 33.]

Up to this point in the encounter, Officer Huddlestone described Mr. Lynn's conduct as a "defensive type resistance."  [Filing No. 35-3 at 40.]  Although Mr. Lynn was not "totally passive," he did not try to "strike," "assault," or "trip" Officer Huddlestone or Officer Challis.  [Filing No. 35-3 at 40-41.]  Indeed, Officer Huddlestone stated that Mr. Lynn "never tried to . . . punch [him], kick [him], [or] elbow [him] on purpose at any time.  It was just all—he kept pulling his arms underneath him."  [Filing No. 52-2 at 13.]

However, Mr. Lynn responded to the second tasing by reaching back with his right arm and grabbing the taser.  [Filing No. 35-4 at 34.]  Officer Challis and Mr. Lynn began struggling over the taser, with each of them having one hand on it.  [Filing No. 35-3 at 35; Filing No. 35-4

at 36.]  After seeing Officer Challis and Mr. Lynn struggle over the taser, with the heel of his palm, Officer Huddlestone hit Mr. Lynn in the side of head three times while yelling at Mr. Lynn to let go of the taser.  [Filing No. 35-3 at 36-37.]  The third blow to Mr. Lynn's head caused him to release the taser, giving Officer Challis full control over it.  [Filing No. 35-3 at 37.]  Mr. Lynn, however, put his right arm back underneath his body.  [Filing No. 35-4 at 37-38.]  Officer Challis then tased Mr. Lynn in the upper portion of his right leg for five seconds.  [Filing No. 35-4 at 38.]  The tasing did not appear to have a dramatic effect, [Filing No. 35-4 at 38], but shortly thereafter, Officer Huddlestone was able to slightly roll Mr. Lynn over, and Officer Challis was then able to free Mr. Lynn's right arm and attach his handcuffs to it.  [Filing No. 35-3 at 38; Filing No. 35-4 at 40.]  Notably, although the officers stated that Mr. Lynn was only tased on three occasions for five seconds each time, the taser report from Officer Challis' taser states that it was used five times for a total of twenty-seven seconds.  [Filing No. 52-5 at 10.]

The officers attached the two pairs of handcuffs that were on each of Mr. Lynn's arms. [Filing No. 35-3 at 39; Filing No. 35-4 at 40.]  By this time, the medics had arrived at the scene, and Mr. Lynn was immediately lifted up and placed in an ambulance.  [Filing No. 35-3 at 39; Filing No. 35-4 at 40.]

Once Mr. Lynn was placed in the ambulance and was being evaluated by medical personnel, Officer Huddlestone noticed that the white powdery substance was still in Mr. Lynn's nose.  [Filing No. 35-3 at 42.]  Officer Challis also observed Mr. Lynn when he was placed in the ambulance.  [Filing No. 35-4 at 43.]  However, Officer Challis did not notice any white substance on Mr. Lynn's face, nor did he notice any blood on Mr. Lynn.  [Filing No. 35-4 at 43-46.] The only white powdery substance Officer Challis noticed was snow, and it was located on Mr. Lynn's clothes.  [Filing No. 35-4 at 44.]  IMPD Lieutenant Steven Atzhorn—who arrived at the

scene shortly after the altercation concluded—spoke with Mr. Lynn while he was in the ambulance and he too did not observe any white substance on Mr. Lynn's face. [Filing No. 52-7 at 5.][2]

Officers Huddlestone and Challis thought that Mr. Lynn should be charged with resisting law enforcement and public intoxication. [Filing No. 35-3 at 47-49.] The next day, February 3, 2011, the Marion County Prosecutor's Office charged Mr. Lynn with both of these crimes, as well as with disarming a police officer. [Filing No. 35-7 at 2-3.] All three of these charges were eventually dismissed on November 28, 2012. [Filing No. 15 at 11.]

### III.
### DISCUSSION

Defendants move for summary judgment on each of Mr. Lynn's claims. The Court will address each claim in turn.

### A.    § 1983 Excessive Force Claim

Defendants move for summary judgment on Mr. Lynn's excessive force claim on two grounds: (1) their conduct did not violate the Fourth Amendment; and (2) they are entitled to qualified immunity. [Filing No. 34 at 25-28; Filing No. 34 at 33-36.] Mr. Lynn contends that summary judgment is not proper on either ground. [Filing No. 51 at 12-16; Filing No. 51 at 18-21.]

### 1.    *Whether Officers Huddlestone and Challis violated Mr. Lynn's Fourth Amendment Rights*

Defendants contend that summary judgment is appropriate on Mr. Lynn's excessive force claim against Officers Huddlestone and Challis. [Filing No. 34 at 27-28.] Their argument in fa-

---

[2] The parties set forth additional evidence regarding events occurring after the incident, such as the arrival of Mr. Lynn's sister on the scene. Most of this evidence is not relevant to the Court's ultimate decision, however, and to the extent that it is, the Court discusses it below.

vor of summary judgment, however, fails to focus in on the proper analysis established by controlling Seventh Circuit precedent, making it impossible for the Court to appropriately analyze whether summary judgment is warranted. To explain why Defendants' argument is deficient, the Court must first set forth the legal standards governing a Fourth Amendment claim. Next, the Court will explain the deficiencies in the Defendants' arguments and Mr. Lynn's response.

A claim that an officer used excessive force in seizing an individual is "analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). "[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Id.* (citations and internal quotation marks omitted). Factors relevant to the inquiry include "'[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009) (alterations in original) (quoting *Graham*, 490 U.S. at 396). "The dispositive question is whether, in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an objectively reasonable manner." *Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011) (citation and internal quotation marks omitted).

A proper application of these principles requires the Court—especially in cases such as this, where different types of force were used at different stages of the encounter—to "carve up the incident into segments and judge each on its own terms to see if the officer[s] w[ere] reasonable at each stage." *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999) (citation and quotation marks omitted). Analyzing each discrete use of force is the only way the Court can properly determine "the reasonableness of the force used . . . *at the time the force [was] applied*." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 724 (7th Cir. 2013) (emphasis added). In a case such as this,

where the officers used different types of force as the encounter escalated and in response to an evolving situation, the force that is reasonable at one moment is not necessarily reasonable at another, and vice versa. *Cf. Plakas v. Drinkski*, 19 F.3d 1143, 1150 (7th Cir. 1994) ("Our historical emphasis on the shortness of the legally relevant time period is not accidental. The time-frame is a crucial aspect of excessive force cases."). In other words, the Court cannot simply say that all of the uses of force were (or were not) reasonable when the type of force used and the circumstances "at the time the force [was] applied" are not identical for each use of force. *Abbott*, 705 F.3d at 724; *cf. Smith v. Ball State Univ.*, 295 F.3d 763, 770 (7th Cir. 2002) ("When police officers face what is essentially a fluid situation, they are entitled to graduate their response to meet the demands of the circumstances confronting them.").

> a.    The parties' fail to properly analyze Mr. Lynn's excessive force claim

Defendants unfortunately do not analyze each use of force individually, as is required to conduct the proper analysis in this case. The reason for this, at least in part, seems to be that Defendants are admittedly unsure which uses of force Mr. Lynn intends to challenge. Several examples of this uncertainty appear in Defendants' briefs. First, they only analyze Officer Huddlestone's leg sweep and take down of Mr. Lynn from the perspective of whether it constituted an illegal seizure—i.e., they operate under the assumption that this force could not be unreasonable. [Filing No. 34 at 22-25.] Relatedly, Defendants only specifically discuss whether "Officer Challis' use of a taser and Officer Huddlestone's three open-hand strikes to his left ear area qualify as unreasonable force" because these are "[p]resumably" the uses of force Mr. Lynn challenges. [Filing No. 34 at 25.] Indeed, in a candid footnote, Defendants admit that "it is unclear specifically which actions of Officer Challis [Mr. Lynn] contends prove [his] claim." [Filing No. 34 at 23 n.16.]

Defendants' lack of clarity regarding Mr. Lynn's claims stems from the fact that Defendants rely on Mr. Lynn's Amended Complaint to make educated guesses regarding the specific conduct Mr. Lynn is challenging. [*See, e.g.*, Filing No. 34 at 23 & n.16; Filing No. 34 at 25.] This guesswork is a problem the Court sees too often—the defendant moves for summary judgment on the claims it thinks may be in play based on the plaintiff's Complaint; then the plaintiff either clarifies its claims in response, only addresses head on the issues the defendant raised, or otherwise writes a brief that is not directly responsive to the defendant's brief; and then the Court is left to sort through what is left based on briefs that talk past each other. But this is unnecessary; contention interrogatories can be used to "minimize uncertainty concerning the scope of [a plaintiff's] claims" before a motion for summary judgment is ever filed.[3] *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996); Fed. R. Civ. Pro. 33(a)(2). Had Defendants pursued such a course here (and Mr. Lynn properly responded to the interrogatory), there would be no uncertainty regarding which acts Mr. Lynn is challenging, and Defendants could have specifically addressed those acts in their briefing.

Even more problematic, however, is that the conduct Defendants do discuss is not analyzed properly. Defendants did not "carve up the incident into segments and [analyze] each on its own terms to see if the officer[s] w[ere] reasonable at each stage." *Deering*, 183 F.3d at 652; *see, e.g.*, *Williams v. Ind. State Police*, --- F.Supp.2d ----, 2014 WL 2693892, *19-26 (S.D. Ind. 2014) (analyzing each use of force separately as the encounter escalated). Because they did not do so, there is no analysis regarding how the *Graham* factors weigh for each use of force; indeed,

---

[3] The Court recognizes that Defendants may have, unbeknownst to the Court, issued the relevant contention interrogatories to Mr. Lynn. Presumably, Defendants did not, given their admitted lack of clarity regarding the specific acts Mr. Lynn is pursuing against which Defendants. But even if they did, they certainly did not rely on them in crafting their Motion for Summary Judgment.

Defendants do not cite *any* specific cases supporting the constitutionality of any of their several uses of force against Mr. Lynn beyond their introductory section that merely sets forth the basic excessive force legal standards.

Given Defendants' deficient briefing, it is perhaps understandable that Mr. Lynn responds to their arguments in similarly unhelpful, general terms. [Filing No. 51 at 14-16.] He analyzes the *Graham* factors, but only whether they were met at the time Officer Huddlestone initially arrived on the scene—that is, not at the time any specific seizure or use of force occurred. [Filing No. 51 at 14-15.] Again, this is not the analysis the Court must undertake. Defendants' reply brief continues this pattern. Instead of discretely analyzing each use of force, Defendants argue that Mr. Lynn is correct that the *Graham* factors were not met initially, but that they were met at some later point in the encounter. [Filing No. 65 at 3-7.]

Defendants' failure to adequately identify and then specifically analyze each particular seizure through the lens of *Graham* has prevented them from crafting arguments that could even potentially demonstrate that they are entitled to summary judgment. The Seventh Circuit has repeatedly made clear that district courts are not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Anderson v. Catholic Bishop of Chicago*, --- F.3d ----, 2014 WL 2959129, *3 (7th Cir. 2014). The Court will not speculate regarding what conduct could possibly be challenged and then make the relevant arguments regarding that conduct for the parties. The Court will instead analyze the claims as the parties have presented them—namely, in very general terms, without parsing whether each distinct use of force was reasonable at the time the force was used.

        b.      <u>Fact issues preclude summary judgment on Mr. Lynn's excessive force claim</u>

The key issue and dispute between the parties is whether Officer Huddlestone reasonably believed that Mr. Lynn was on drugs rather than the person who had reportedly suffered from a seizure. Defendants contend that "Officer Huddlestone reasonably believed [Mr. Lynn] was under the influence of some form of narcotic[.]" [Filing No. 34 at 27; *see also* Filing No. 65 at 3 (noting that "Officer Huddlestone observed that [Mr. Lynn's] face was covered in blood, he had wet stringy hair, an extremely unsteady balance, and a white powdery substance under his nose, inside his nostrils, and on his upper lip, which . . . Officer Huddlestone believed was either cocaine or a crushed up pill").] Mr. Lynn argues that Officer Huddlestone's belief that he was on narcotics was unreasonable. [Filing No. 51 at 17.]

The Court agrees with Mr. Lynn that there is a fact issue regarding the reasonableness of Officer Huddlestone's belief that Mr. Lynn had recently taken narcotics. While the Court does "not doubt or reconsider [Officer Huddlestone's] testimony" that he believed Mr. Lynn was on narcotics, "the question remains whether it was objectively reasonable for [him to do so] in the face of the contradictory information" he had received. *Phillips v. Community Ins. Corp.*, 678 F.3d 513, 522 (7th Cir. 2012). First and foremost, the undisputed evidence is that Officer Huddlestone was called to the scene because a "subject was down, possibly having a seizure," not due to any suspicion of criminal activity. [Filing No. 32, Track 4 at 00:16-00:20; Filing No. 52-1; *see* Filing No. 35-3 at 7 (Officer Huddlestone acknowledging that he heard the dispatch and saw the CAD statement on his computer, both of which relayed that there was a man down possibly having a seizure).] Although Defendants argue that Officer Huddlestone had no way of

knowing that Mr. Lynn was the man described by dispatch,[4] a jury could conclude that it was unreasonable for Officer Huddlestone to think otherwise given that (1) Mr. Lynn's condition was consistent with a man who had fallen due to, and was still suffering the after effects of, a seizure, [*see* Filing No. 52-6 at 8 (Mr. Lynn's police expert concluding that "[t]his incident was clearly an obvious epileptic emergency."); Filing No. 52-6 at 5 (Mr. Lynn's police expert stating that "Officer Huddlestone, ignoring the obvious postictal symptoms exhibited by Mr. Lynn, grabbed Mr. Lynn from behind, and swept his legs out from underneath him, causing Mr. Lynn to fall to the ground")], and (2) Officer Huddlestone found Mr. Lynn in the very spot the 9-1-1 dispatcher said he was observed convulsing: in an empty parking lot on Washington Street, [*see* Filing No. 52-1 at 2].

Further casting doubt on the reasonableness of Officer Huddlestone's belief is the fact that there is sufficient evidence for a jury to doubt the reliability of Officer Huddlestone's description of Mr. Lynn. Officer Challis stated that he did not observe any blood or white substance on Mr. Lynn (other than snow), [Filing No. 35-4 at 43-46], and Lieutenant Atzhorn too disavowed seeing any blood or white substance on Mr. Lynn's face, [Filing No. 52-7 at 5]. Based on this evidence, a jury could discredit Office Huddlestone's testimony that Mr. Lynn was "covered in blood" and had a "very obvious" white powdery substance "on his nose, inside his nostrils and on his upper lip." [Filing No. 35-3 at 14.] Moreover, although both Officer Challis

---

[4] Defendants repeatedly suggest that the officers' conduct was justified, at least in part, because "neither Officer Huddlestone nor Officer Challis had any reasonable way of knowing whether [Mr. Lynn] was armed, which could not only injure the officers, but also the innocent citizens who were standing nearby." [Filing No. 34 at 28.] But this is always true at the beginning of nearly every police encounter, and the hypothetical possibility that a person may be armed does not alone increase the justification for using force. *See Overton v. Hicks*, 2008 WL 2518229, *8 (S.D. Ind. 2008) ("Police officers may not use force where they have 'no *particular reason* to believe' that a person is armed or threatening.") (emphasis added) (quoting *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993)).

and Lieutenant Atzhorn arrived on the scene after Officer Huddlestone, Officer Huddlestone stated that the white powdery substance was still on Mr. Lynn's nose and inside his upper lip when he was in the ambulance, [Filing No. 35-3 at 42], which is when both Officer Challis and Lieutenant Atzhorn observed Mr. Lynn and testified otherwise, [Filing No. 35-4 at 43; Filing No. 52-7 at 5].[5]

If, as a reasonable jury could conclude, Officer Huddlestone's belief that Mr. Lynn was on narcotics rather than experiencing a seizure was unreasonable, then Mr. Lynn's "condition is relevant to the question of whether [Officer Huddlestone] used a reasonable amount of force against him." *McAllister v. Price*, 615 F.3d 877, 883 (7th Cir. 2010). First, it distinguishes this case from other cases where the plaintiff's "medical condition was completely hidden" and thus irrelevant to the reasonableness analysis. *Id.* at 882-83 (distinguishing *Smith*, 295 F.3d at 769, and *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 594 (7th Cir.1997), because in each of those cases the officers were unaware of the plaintiff's medical condition when they used force). Second, it is relevant because it affects the Court's analysis of the *Graham* factors for each and every use of force by the officers. *See id.* at 883. If Mr. Lynn was in the midst of a seizure rather than on drugs, a reasonable officer would have no reason to believe that *any* of the *Graham* factors are met when Officer Huddlestone first swept out Mr. Lynn's leg and took him to the ground; specifically, Mr. Lynn would not (1) have committed any crime; (2) posed an immediate

_____

[5] Although defendants repeatedly state that Officer Huddlestone's testimony regarding Mr. Lynn's appearance when Officer Huddlestone arrived on the scene is undisputed, it is not directly disputed because the only other witness close enough to observe Mr. Lynn—Mr. Lynn himself—has no memory of the incident. The Seventh Circuit has cautioned that, in similar situations (such as when the defendant officer kills the plaintiff), the Court "must undertake a fairly critical assessment [of the evidence] to decide whether the officer's testimony could reasonably be rejected at trial." *Estate of Escobedo v. Martin*, 702 F.3d 388, 409 (7th Cir. 2012) (citation and quotation marks omitted). The Court undertakes this inquiry here, and, for the reasons explained, the Court concludes that a reasonable jury could reject Officer Huddlestone's testimony.

threat to the safety of the officers or others; or (3) be considered actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. And if none of these factors are met, a reasonable jury could conclude that Officer Huddlestone's initial force (taking Mr. Lynn to the ground by sweeping his leg out from underneath him) and both officers' subsequent uses of force (multiple tasings and strikes to the head)[6] were unreasonable and thus violated Mr. Lynn's Fourth Amendment rights. In short, if Officer Huddlestone's belief that Mr. Lynn was on drugs was unreasonable, and it was instead reasonable to believe that Mr. Lynn had just suffered from a seizure, it infects the entire analysis of whether the force used by Officers Huddlestone and Challis was reasonable.

To be sure, that Mr. Lynn was undergoing a seizure is not the only reasonable view of the evidence. A reasonable jury could credit Defendants' version of events, which in turn would alter the analysis of the *Graham* factors. *See McAllister*, 615 F.3d at 883 ("Of course, [that the plaintiff was suffering from a diabetic episode] is not the only possible interpretation of the evidence; if [the officer] reasonably thought [the plaintiff] was intoxicated, [the plaintiff's] unresponsiveness may have created a safety threat by adding the element of unpredictability.") (citation and quotation marks omitted). But because a reasonable jury could also reach a different

---

[6] Although in denying summary judgment the Court relies primarily on the fact issues regarding the reasonableness of Officer Huddlestone's belief that Mr. Lynn was on narcotics, it is worth noting that other important fact issues exist. For example, while the officers stated that Officer Challis only tased Mr. Lynn three times, the computer log stored on the taser shows that they tased him five times. [Filing No. 52-5 at 10.] Such a factual dispute is important is assessing the reasonableness of the officers' force, and cannot be resolved on summary judgment. *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 858 (7th Cir. 2010) (reversing the grant of summary judgment because "[t]he evidence conflicts, most importantly, on how many times [the plaintiff] was Tasered. [The officer] testified that he deployed his Taser five or six times, . . . [b]ut the Taser's internal computer registered twelve trigger pulls, . . . . On a Fourth Amendment excessive-force claim, these are key factual disputes not susceptible of resolution on summary judgment.").

conclusion, the Court cannot grant summary judgment to Defendants on Mr. Lynn's excessive force claim.

2.    *Whether Officers Huddlestone and Challis are entitled to qualified immunity*

The parties next dispute whether Officers Huddlestone and Challis are entitled to qualified immunity.  To determine whether a defendant is entitled to qualified immunity, courts must address two issues: "(1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was clearly established at the time of the violation." *Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014) (citation omitted).  "In other words, the plaintiff must show not only that her constitutional rights were violated, but that any reasonable official under the circumstances would have realized that her rights were being violated." *Easterling v. Pollard*, 528 Fed. Appx. 653, 656-57 (7th Cir. 2013).  "To be clearly established at the time of the challenged conduct, the right's contours must be 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right,' and 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013) (quoting *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012)).  The plaintiff can carry his burden to identify the clearly established right "either by identifying a 'closely analogous case that established a right to be free from the type of force the police officers used on him' or by showing 'that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment.'" *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (quoting *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008)).

As an initial matter, the Court notes that the same briefing deficiencies that plagued the excessive force claim are present here. Just as the Court must assess whether the officers' use of force was reasonable at each stage of the encounter, the Court must determine at each stage whether the right to be free from the particular type of force used was clearly established. *See, e.g.*, *Estate of Escabedo v. Bender*, 600 F.3d 770, 781-86 (7th Cir. 2010) (assessing whether the defendant officers were entitled to qualified immunity for each distinct use of force). Because the briefing does not conduct this analysis, the Court will follow the course charted above by addressing only the general issues the parties present.

The Court has already determined that a reasonable jury could conclude that Officers Huddlestone and Challis violated Mr. Lynn's Fourth Amendment rights, so it turns now to whether the right at issue was clearly established at the time of the violation. Mr. Lynn identifies several cases he says clearly established that the officers' use of force was excessive given Mr. Lynn's medical state. [Filing No. 51 at 19-20.] Defendants attempt to distinguish some, but not all, of Mr. Lynn's cases, and rely again on their argument that Officer Huddlestone "had no way of knowing whether [Mr. Lynn] was the subject of the 911 call" and that, in light of this, his conduct was objectively reasonable. [Filing No. 65 at 11-12.]

Given the nature of the fact issues identified above that a jury must resolve, the Court cannot conclude that the officers are entitled to qualified immunity. At least two of the cases to which Mr. Lynn points the Court clearly establish that, when the facts are taken in the light most favorable to Mr. Lynn, he had the right to be free from the forced used against him. In *McAllister*, the Seventh Circuit held it to be clearly established that a law enforcement officer who suspected the plaintiff of driving while intoxicated (but may have actually been suffering from a diabetic episode) could not throw the plaintiff out of his car "by applying his knee to [the plain-

tiff's] lower back, with his full body weight behind it." 615 F.3d at 879, 884-85. The Seventh

Circuit reached this conclusion by relying on cases involving a general disproportionate use of

force by a law enforcement officer (e.g., pushing a woman suspected of drunk driving, applying

handcuffs too tightly that caused swelling of the wrists), explicitly stating that those cases did not

"involve the same scenario at issue here," but "do suggest that [the officer] should have been on

notice that elements of his conduct could violate [the plaintiff's] constitutional rights." *Id.* at

885. Also important in *McAllister* was the fact that it was disputed whether the officer was

aware of the plaintiff's diabetic condition and that the officer clearly used a significant degree of

force. *See id.* (distinguishing *Smith* on these two grounds).

Although this case does not present the "same scenario" at issue in *McAllister*, if the of-

ficers unreasonably concluded that Mr. Lynn was suffering from a seizure rather than on drugs

(which a reasonable jury could conclude), the officers "should have been on notice that elements

of [their] conduct could violate [Mr. Lynn's] constitutional rights." *Id.* Officer Huddlestone

swept Mr. Lynn's legs out from under him to take him to the ground, and Officer Challis tased

Mr. Lynn several times.[7] [Filing No. 35-3 at 17; Filing No. 35-3 at 34; Filing No. 35-4 at 29;

Filing No. 35-4 at 32; Filing No. 35-4 at 38.] Like in *McAllister*, this is a significant degree of

force to use against one who is merely suffering from a medical condition, rather than commit-

ting a crime. *See Abbott*, 705 F.3d at 726 (describing the use of a taser as "'more than a *de min-

imis* application of force,'" and that it "falls somewhere in the middle of the nonlethal-force

spectrum.") (quoting *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009)). And even if the force

---

[7] Again, as stated above, the Court will not parse the encounter for each use of force by the De-
fendants, and will follow the parties' course in addressing qualified immunity generally. Be-
cause Officer Huddlestone's leg sweep and take down of Mr. Lynn and at least some of Mr.
Challis' tasings of Mr. Lynn occurred before any conduct on Mr. Lynn's part that could be
deemed combative took place, the officers are not entitled to qualified immunity.

is less significant than that used in *McAllister*, it is clearly established "that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996). Because a reasonable jury could conclude that Mr. Lynn was an innocent citizen undergoing a medical emergency who was subject to force by law enforcement "without any provocation whatsoever," *id.*, the Court must deny Officers Huddlestone and Challis qualified immunity.

### B. False Arrest Claim

The Court turns next to Mr. Lynn's false arrest claim. As with Mr. Lynn's excessive force claim, the parties dispute both whether a violation occurred and whether qualified immunity applies. [Filing No. 34 at 28-32; Filing No. 51 at 16-17.]

Defendants contend that no false arrest claim can go forward because probable cause existed to arrest Mr. Lynn for public intoxication, resisting law enforcement, and disarming a law enforcement officer. [Filing No. 34 at 31.] Probable cause existed to arrest Mr. Lynn for these three offenses, say Defendants, because, respectively, Officer Huddlestone observed Mr. Lynn with signs that he was under the influence of narcotics, Mr. Lynn "resisted the officers' attempts to control him," and Mr. Lynn "attempted to disarm Officer Challis when he grabbed the officer's taser." [Filing No. 34 at 31-32.]

Mr. Lynn responds that the officers impermissibly ignored a clearly exculpatory fact—namely, that Mr. Lynn was in the midst of a medical emergency rather than under the influence of drugs. [Filing No. 51 at 16-17.] Moreover, for reasons discussed above, Mr. Lynn contends that a reasonable jury could conclude that Officer Huddlestone's belief that Mr. Lynn had used drugs was unreasonable and fail to give it credence, which would undermine any basis for probable cause. [Filing No. 51 at 17.]

Defendants reply with essentially the same arguments regarding Officer Huddlestone's beliefs about Mr. Lynn's drug use discussed above with respect to the excessive force claim. [Filing No. 65 at 8-10.] Specifically, they argue that Officer Huddlestone's observations of Mr. Lynn when he arrived at the scene were undisputed, and that in any event, it is undisputed that Mr. Lynn attempted to grab Officer Challis' taser out of his hand. [Filing No. 65 at 9.]

The parties both focus on whether probable cause existed likely because "[t]he existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest." *Abbott*, 705 F.3d at 713. But, as with the excessive force claim, the parties argue past each other and ignore the analysis the Court must undertake. Defendants want the Court to assess probable cause in light of Mr. Lynn's grabbing Officer Challis' taser, while Mr. Lynn assesses probable cause in very general terms from the point in time that Officer Huddlestone arrived on the scene. But the relevant inquiry is whether probable cause existed "*at the time of arrest.*" *Tebbens v. Mushol*, 692 F.3d 807, 816 (7th Cir. 2012) (emphasis added); *accord Abbott*, 705 F.3d at 715. "Therefore, before [the Court] turn[s] to the probable cause inquiry, [it] must determine when the arrest took place." *Tebbens*, 692 F.3d at 816. To determine when the arrest occurred, the Court must assess "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Huff v. Reichert*, 744 F.3d 999, 1006 (7th Cir. 2014) (quoting *Florida v. Bostick*, 501 U.S. 429, 436-37 (1991)). The

difficulty is that neither party says a word about when the arrest took place; they instead jump straight to assessing whether there was probable cause.[8]

Again, Defendants ask this Court to enter summary judgment in their favor, but have not conducted the proper analysis nor made the necessary arguments for the Court to determine whether summary judgment is proper. As already noted, the Seventh Circuit has repeatedly made clear that district courts are not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Anderson*, 2014 WL 2959129, at \*3. Although both parties failed to analyze when the arrest occurred so that the Court could properly undertake the probable cause analysis, because Defendants bear the burden on summary judgment of demonstrating that they are entitled to judgment in their favor, the result is that summary judgment must be denied on this claim.

### C.      § 1983 Failure to Intervene Claims

The Court turns next to whether summary judgment is warranted on Mr. Lynn's § 1983 failure to intervene claim. "[A]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (empha-

---

[8] The Court notes that the same difficulties prevent it from assessing whether the officers are entitled to qualified immunity. This is because qualified immunity for a false arrest claim merely adds an additional "layer of protection." *Abbott*, 705 F.3d at 714. In other words, the inquiry for qualified immunity is not whether there was actually probable cause, but whether there is "arguable probable cause." *Id.* at 714-15 (citation and quotation marks omitted). But without identifying when the arrest occurred, the Court is unable to adequately assess whether there was arguable probable cause *at the time of the arrest*, as is required. *See Tebbens*, 692 F.3d at 816.

sis in original) (citation and quotation marks omitted).  The Court has already concluded that fact issues exist regarding whether Officers Huddlestone and Challis used excessive force against Mr. Lynn and whether Mr. Lynn was falsely arrested.  Therefore, the Court need only consider whether each officer "had a realistic opportunity to intervene to prevent the harm from occurring."  *Id.*

Unfortunately, Defendants' two sentences regarding the opportunity to intervene element erroneously focus only on uses of force that occurred late in the encounter, rather than each use of force that occurred.  [*See* Filing No. 34 at 32.]  Moreover, as the Court discussed regarding the false arrest claim, Defendants did not even address when the arrest occurred.  Without first assessing each use of force or determining when the allegedly false arrest occurred, neither the Court nor the parties can adequately assess whether either officer had a "realistic opportunity to intervene to prevent the harm from occurring."  *Abdullahi*, 423 F.3d at 774.  Accordingly, the Court has no basis to grant summary judgment in Defendants' favor on Mr. Lynn's failure to intervene claim.

**D.    § 1983 Municipal Liability**

The Court need not address Mr. Lynn's § 1983 municipal liability claim against the City of Indianapolis because Mr. Lynn conceded this claim, or at the very least, waived any arguments he may have had to oppose summary judgment.  In response to Defendants' argument that Mr. Lynn has insufficient evidence to establish municipal liability, [Filing No. 34 at 36-41], Mr. Lynn states that he "concedes that there may be insufficient evidence . . . to prove a *Monell* claim."  [Filing No. 51 at 23.]  Even if this falls just short of an outright concession, Mr. Lynn waived any opposition to summary judgment by not setting forth, let alone developing, his arguments regarding this claim.  *See Hutt v. AbbVie Products LLC*, --- F.3d ----, 2014 WL

3033126, *7 (7th Cir. 2014) (holding that an argument "mentioned" but not "develop[ed]" is waived); *Long-Gang Lin v. Holder*, 630 F.3d 536, 543 (7th Cir. 2010) ("The failure to adequately develop and support [an] argument[] results in waiver.").

### E.     ADA Claim

The Court turns next to Mr. Lynn's ADA claim against the City of Indianapolis.  Mr. Lynn's claim is specifically brought under Title II of the ADA, which provides that "no eligible disabled person 'shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination' by a state or local unit of government." *Brumfield v. City of Chicago*, 735 F.3d 619, 626 (7th Cir. 2013) (quoting 42 U.S.C. § 12132).  Defendants contend that they are entitled to summary judgment because there is no evidence that the officers' conduct toward Mr. Lynn excluded him from or denied him the benefits of any public service, program, or activity, or otherwise subjected him to discrimination because of his disability.  [Filing No. 34 at 44-45.] Mr. Lynn responds by pointing the Court to *Lewis v. Truitt*, 960 F.Supp. 175 (S.D. Ind. 1997), which allowed an ADA claim to proceed if the plaintiff could "show that (1) he was disabled, (2) the defendants knew or should have known he was disabled, and (3) the defendants arrested him because of legal conduct related to his disability." *Id.* at 178.

Although the Court in *Lewis* allowed such a claim to proceed, the Seventh Circuit has never recognized such a claim under Title II of the ADA.  Following *Lewis*, however, the Fifth Circuit has foreclosed such claims:

> Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents . . . prior to the officer's securing the scene and ensuring that there is no threat to human life.  Law enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations. To require the officers to factor in whether their actions are going to

- 25 -

comply with the ADA, in the presence of exigent circumstances and prior to se-
curing the safety of themselves, other officers, and any nearby civilians, would
pose an unnecessary risk to innocents.

*Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000).  And at least one other district court in

this circuit has followed the Fifth Circuit's reasoning in holding that a Title II ADA claim was

not viable in similar circumstances.  *See Sallenger v. City of Springfield*, 2005 WL 2001502,

*30-31 (C.D. Ill. 2005) (surveying cases and concluding that "the *Hainze* court's analysis [is]

most compelling").  The Court agrees with the rationale in *Hainze* and follows it here.  However,

as the courts in both *Hainze* and *Sallenger* have noted, this holding does not entirely foreclose

relief to plaintiffs like Mr. Lynn, as remedies may be pursued under § 1983 and state law.  *See*

*Hainze*, 207 F.3d at 801; *Sallenger*, 2005 WL 2001502, at * 31.

Accordingly, the City of Indianapolis is entitled to summary judgment on Mr. Lynn's

ADA claim.

**F.      State Law Claims**

Mr. Lynn asserted the following state law claims against Officers Huddlestone and Chal-

lis and the City of Indianapolis: assault, battery, excessive force, false imprisonment, and mali-

cious prosecution.  Defendants move for summary judgment on these claims collectively, so the

Court will address them as such.  First, Defendants argue that Officers Huddlestone and Challis

are entitled to immunity under the Indiana Tort Claims Act ("ITCA").  [Filing No. 34 at 41-43.]

Second, as to the City of Indianapolis' liability, Defendants maintain that there is insufficient ev-

idence to prove any of these claims.  [Filing No. 34 at 43.]  The Court will address each argu-

ment in turn.

1. *Whether Officers Huddlestone and Challis are entitled to immunity under the ITCA*

Defendants assert that Officers Huddlestone and Challis are entitled to immunity under Ind. Code § 34-13-3-5(b). [Filing No. 34 at 41.] This section of the ITCA provides, in relevant part: "A lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally. However, if the governmental entity answers that the employee acted outside the scope of the employee's employment, the plaintiff may amend the complaint and sue the employee personally." Ind. Code § 34-13-3-5(b). This provision bars suit against Officers Huddlestone and Challis personally, say Defendants, because the parties agree that the officers acted within the scope of their employment and, in any event, "there is no evidence that the . . . officers acted outside the scope of their employment" on the day in question. [Filing No. 34 at 41.]

In response, Mr. Lynn misapprehends the type of ITCA immunity Defendants seek for the officers. Instead of addressing the ITCA section Defendants invoke, § 34-13-3-5(b), Mr. Lynn focuses on whether the officers are entitled to law enforcement immunity under Ind. Code § 34-13-3-3(8). [Filing No. 51 at 25-26.] But these two immunity sections are distinct and serve different purposes.

Defendants are correct that the officers are entitled to immunity under § 34-13-3-5(b). Mr. Lynn alleges and Defendants concede that the officers were acting within the scope of their employment during the encounter in question. [Filing No. 11 at 9-12; Filing No. 34 at 42-43.] Because the City of Indianapolis does not contend otherwise, § 34-13-3-5(b) "bars an action by the claimant against the [officers] personally." Ind. Code § 34-13-3-5(b); *see Renquette v. Bd. of Sch. Trustees ex rel. Brownsburg Community Sch. Corp.*, 540 F.Supp.2d 1036, 1046 (S.D. Ind. 2008)* (holding that Ind. Code § 34-13-3-5(b) barred the plaintiffs' state tort claims against the

individual state employees because the parties did not contest that the employees were acting within the scope of their employment). Accordingly, Officers Huddlestone and Challis are entitled to summary judgment on Mr. Lynn's state law claims. As will be discussed below, however, these claims survive against the City of Indianapolis.

2. *Whether there is sufficient evidence for Mr. Lynn to prove his state law claims against the City of Indianapolis*

Mr. Lynn brings the same five state law claims against the City of Indianapolis, arguing that it is liable for the officers' actions under *respondeat superior*, which imposes liability "on an employer for the wrongful acts of his employee which are committed within the scope of employment." *Stropes v. Heritage House Childrens Ctr. of Shelbyville, Inc.*, 547 N.E.2d 244, 247 (Ind. 1989). Defendants argue that they are entitled to summary judgment on these claims because Mr. Lynn lacks sufficient evidence to prove them. [Filing No. 34 at 43.] First, Defendants rely on the same evidence discussed above regarding Mr. Lynn's excessive force claim, which Defendants say proves that "neither Officer Huddlestone nor Officer Challis assaulted, battered, or used excessive force on the Plaintiff." [Filing No. 34 at 43.] Second, Defendants rely on the evidence set forth above regarding their false arrest claim to argue that the officers "had probable cause to arrest [Mr. Lynn], therefore defeating any claim of false imprisonment or malicious prosecution." [Filing No. 34 at 43.]

The Court need not address these arguments at length, as the Court's conclusions above foreclose Defendants' positions. As to Mr. Lynn's excessive force claim, the Court already determined that fact issues remain regarding whether the officers used excessive force against Mr. Lynn, requiring his state law excessive force claim to also survive summary judgment. *See Fidler v. City of Indianapolis*, 428 F.Supp.2d 857, 866 (S.D. Ind. 2006) ("Indiana's excessive force standard effectively parallels the federal [Fourth Amendment] standard."). And if a jury could

conclude that the officers used excessive force against Mr. Lynn, it could also conclude that the officers committed assault and battery. *See Wilson v. Issacs*, 929 N.E.2d 200, 203-04 (7th Cir. 2010) ("If an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery."). Accordingly, summary judgment for the City of Indianapolis is unwarranted on these three claims.

As Defendants recognize, Mr. Lynn's false imprisonment and malicious prosecution claims both require Mr. Lynn to prove there was not probable cause to arrest and prosecute, respectively, Mr. Lynn. *See Estate of Mayer v. Lax, Inc.*, 998 N.E.2d 238, 249-50 (Ind. App. 2013) (holding that a malicious prosecution claim requires proof that, among other things, "the defendant had no probable cause to institute the action"); *Row v. Holt*, 864 N.E.2d 1011, 1016 & n.4 (7th Cir. 2007) (explaining that when a claim "for false imprisonment stems from [an] alleged false arrest, we need not make a separate analysis for the former," and that both claims require proof of probable cause). Defendants' probable cause argument consists of one sentence— that "[t]he designated evidence also proves the Defendant officers had probable cause to arrest [Mr. Lynn]"—and they cite to their arguments regarding Mr. Lynn's § 1983 false arrest claim. [Filing No. 34 at 43.] But for the same reasons discussed above with respect to that claim, Defendants failed to analyze when the arrest occurred and thus the Court cannot determine whether probable cause existed regarding Mr. Lynn's false imprisonment claim.

The same is true with respect to Mr. Lynn's malicious prosecution claim: Defendants do not even assert, let alone develop an argument, that there was "probable cause to institute the ac-

tion."[9] *Estate of Mayer*, 998 N.E.2d at 249-50.  Because the Court will not construct Defendants' arguments for them, *Anderson*, 2014 WL 2959129, at *3, summary judgment for the City of Indianapolis is not warranted on either of these claims.

## IV.
### CONCLUSION

For the reasons explained, Defendants' Motion for Summary judgment is **GRANTED IN PART** and **DENIED IN PART**.   The Court **GRANTS** summary judgment in Defendants' favor on Mr. Lynn's § 1983 municipal liability claim against the City of Indianapolis, his ADA claim against the City of Indianapolis, and his state law claims against Officers Huddlestone and Challis.  The Court **DENIES** summary judgment as to all other claims.  The following claims remain for trial:

- § 1983 excessive force claim against Officers Huddlestone and Challis

- § 1983 false arrest claim against Officers Huddlestone and Challis

- § 1983 failure to intervene claim against Officers Huddlestone and Challis

- State law claims of assault, battery, excessive force, false imprisonment, and malicious prosecution against the City of Indianapolis

No partial final judgment shall issue.

---

[9] Mr. Lynn conceded that "his state law claims for malicious prosecution should fail as to the defendant officers."  [Filing No. 51 at 27.]  He did not, however, concede his malicious prosecution claim against the City of Indianapolis.  Should he no longer wish to pursue this claim against the City of Indianapolis, he should dismiss it.

**<u>Distribution via ECF to all counsel of record</u>**